UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BENJAMIN C. BLAKE,               )
          Plaintiff,             )
                                 )
     vs.                         )          1:08-cv-1268-LJM-DML
                                 )
MICHAEL ASTRUE, Commissioner of  )
Social Security Administration,  )
          Defendant.             )

## ENTRY ON JUDICIAL REVIEW

In a decision dated January 18, 2002 (the "Comparison Point Decision" or "CPD"),[1]

Administrative Law Judge Andrew F. Tranovich ("ALJ Tranovich") found that plaintiff,

Benjamin C. Blake ("Blake"), was disabled, as defined by the Social Security Act, as of

December 29, 1999.  R. at 354.  On July 27, 2007, Administrative Law Judge Reinhardt

Korte ("ALJ Korte") determined that Blake's disability ended on July 1, 2004.  R. at 30.  On

July 21, 2008, the Appeals Council denied review, thus rendering the ALJ Korte's findings

the final decision of the Commissioner.  *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir.

1999); R. at 7-9.  Blake requests judicial review of ALJ Korte's decision.  The Court rules

as follows.

---

[1] ALJ Korte's July 27, 2007, decision mentions a February 17, 2002, which ALJ Korte labels the "comparison point decision" or the "CPD".  R. at 20.  Both parties also reference this February 17, 2002, decision, but the parties cite to the January 18, 2002, decision.  Furthermore, the Court is unable to find a February 17, 2002, decision in the record.  Accordingly, the Court uses the January 18, 2002, decision as the CPD.

# I.  BACKGROUND

Blake was born on May 20, 1974.  R. at 352.  On December 29, 1999, when Blake's disability began, he was twenty-five years old.  Blake has not worked since the date his disability began.  *Id.*  Prior to this date, Blake worked as a cut man in the vinyl siding business, a cabinet builder, a car detailer, and a fast food preparer.  *Id.*  Blake has a ninth grade education.  *Id.*

## A.  MEDICAL HISTORY PRIOR TO THE JANUARY 18, 2002, CPD

Blake fell in December of 1999, after which he had unremitting back pain, difficulty walking, weakness in his left leg, and numbness in his left foot.  R. at 208.  He attended physical therapy as part of his treatment, but his symptoms did not improve.  R. at 352-53. An MRI taken of Blake on March 7, 2000, showed Grade I spondylolisthesis[2] of L5 and S1 with impingement of the left L5 nerve root.  R. at 306-07.  An x-ray showed pars defect at L5 and mild enterolisthesis[3] of L5 and S1.  R. at 308.  Blake underwent back surgery on April 27, 2000, consisting of L5 laminectomy[4] and L5-S1 pedicle screw fusion.  R. at 195. Blake's back pain continued, so on January 23, 2001, he had a second surgery—another fusion and the placement of a bone simulator.  R. at 76, 93.  On May 22, 2001, Blake had a third surgery to remove the bone simulator due to complications.  R. at 71.

---

[2] "Spondylolisthesis" is defined as: "Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum."  STEDMAN'S MED. DIC. 1813 (28th ed. 2006) ("STEDMAN'S").

[3] "Enterolisthesis" is defined as: "Presence of calculi . . . ."  STEDMAN'S 648.

[4] "Laminectomy" is defind as: "Excision of a vertebra lamina; commonly used to denote removal of the posterior arch."  STEDMAN'S 1046.

On June 12, 2000, after Blake's first surgery, Dr. J.V. Corcoran performed a residual functional capacity ("RFC") assessment on Blake.  R. at 289-96.  According to this assessment, Blake could occasionally lift fifty pounds; frequently lift twenty-five pounds; stand or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; was unlimited in his ability to push or pull; had minor postural limitations; and no manipulative, visual, communicative, or environmental limitations.  *Id.*  During this time, Blake took Vicodin and Percodet for pain.  R. at 305, 352.

On January 8, 2001, upon the request of the Disability Determination Bureau, Blake saw Jacqueline Remondet Wall, PhD ("Dr. Wall"), for a mental status evaluation.  R. at 326-32.  Blake told Dr. Wall that his pain was a five or six out of ten, and that at its greatest intensity his pain would be ten, at its least three, and during his visit with Dr. Wall it was at four.  R. at 327.  Dr. Wall diagnosed Blake with Pain Disorder, Associated with Psychological Factors and a General Medical Condition; Major Depressive Episode, Single Occurrence; and R/O Dysthymic disorder.  R. at 332.  She rated his current Global Assessment of Function ("GAF") score at fifty.  R. at 332.

On November 6, 2001, Blake visited Dr. Michael Morone ("Dr. Morone"), a neurosurgeon, because Blake continued to have back and leg pain.  R. at 94-95.  Dr. Morone determined that Blake had no lumbar tenderness, decreased range of motion secondary to complaints of pain, a good range of motion in his lower extremities but increased back pain with full knee extension, and absent ankle jerk on the left.  R. at 95. On December 14, 2001, Blake had a CT myelogram of his lumbar spine, from which Dr. Morone concluded that there was no evidence of nerve compression, there was a mild anterior listhesis of L5 and S1, and the nerve roots "fill[ed] out nicely."  R. at 93.  Dr.

3

Morone suspected that Blake had failed back surgery syndrome and suggested weight loss, physical therapy, back strengthening exercises, and pain management options. R. at 93.

## B.  THE JANUARY 18, 2002, CPD

In reaching his decision, ALJ Tranovich considered the testimony of medical expert Dr. Christopher Stack ("Dr. Stack"), who testified that Blake had severe lumbar spondylosis and spondylolisthesis.  R. at 352.  Dr. Stack also testified that Blake's back problems did not meet or equal the requirement of any listed impairment, but they did render him disabled. R. at 353.  Further, Blake would be unable to perform even sedentary work until he lost weight and underwent physical therapy and back strengthening exercises.  *Id.*

Based on the medical records and testimony, ALJ Tranovich found that Blake had not engaged in gainful activity since December 29, 1999; that Blake's severe impairments were lumbar spondylosis and spondylolisthesis; that Blake's assertions concerning his limitations and inability to work were credible; that Blake did not have the RFC to perform even sedentary level work on a sustained and regular basis; that Blake was unable to perform past relevant work; that Blake had a limited education; and that Blake did not have any transferrable work skills within his RFC.  R. at 354.  Thus, ALJ Tranovich found that Blake was disabled as defined by the Social Security Act.  *Id.*  The ALJ also determined that Blake's condition was expected to improve, so he recommended that the Indiana Disability Determination Bureau review his case after one year to determine Blake's ability to work.  R. at 355.

4

## C. MEDICAL HISTORY AFTER THE JANUARY 18, 2002, CPD

Dr. Andrew Hector ("Dr. Hector") was Blake's treating physician from September 2001 through the 2006 hearing with ALJ Korte.  R. at 518.  During this time period, Dr. Hector examined Blake numerous times for neck and back pain, and prescribed to him several pain medications, including Vicoprofen, Duragesic pain patches, and Flexeril.  R. at 509, 511, 513, 514, and 520.

Dr. Hector referred Blake to Community Health Network Rehab and Sports Medicine, where on September 16, 2003, physical therapist Wade Lytle ("Lytle") conducted a functional capacity evaluation to determine whether Blake was capable of competitive employment.  R. at 663-64.  The record contains only a summary of the results, not the specifics.  Lytle recommended the following regarding Blake's ability to work:

> Mr. Blake did not demonstrate the required functional ability to perform even at a sedentary position.  The main limitations are sustained positional tolerances longer than [fifteen] minutes.  But he reports that he performs childcare for his [six] and [one] y[ea]r olds while his spouse is at work.  This report would indicate that he is capable of work to some capacity.  The problem may be structure.  An employer often requires static postures to perform work tasks.  Mr. Blake  requires an extreme amount of flexibility to change positions as his pain demands.  For this reason Mr. Blake is not a candidate for competitive employment.

R. at 664.  Lytle further found that  "[o]verall test findings, in combination with clinical observations, suggest the presence of full physical effort on Mr. Blake's behalf."  R. at 663.  Lytle also determined the following regarding Blake's reliability:

> Overall test findings, in combination with clinical observations, suggest some minor inconsistency to the reliability/accuracy of Mr. Blake's subjective reports of pain/limitation.  Overall inconsistencies were considered minor, with his subjective reports generally matching well with distraction-based clinical observations.  In describing such findings, this evaluator is by no means implying intent.  Rather, it is simply stated that Mr. Blake can do more at times than he currently states or perceives.  While his subjective reports

5

should not be disregarded, they should be considered within the context of such RFC findings.

*Id.* Lytle's summary stated that he was unable to finish testing Blake due to pain. R. at 664.

From February 2004 to May 2004, Blake attended twenty-nine physical therapy sessions with Lytle. R. at 626. When Blake appeared for his first session, he walked in with a straight cane, which he used for ambulation, and his posture appeared like that of a person who was seventy or eighty. R. at 643. His spinal movements in supine showed rotation to be limited about fifty percent. *Id.* Manual muscle testing of both arms tested at greater than or equal to four plus out of five. *Id.* He was able to perform ten repetitions of prone whole leg hip extensions on his right but was unable to lift his left leg. *Id.* After nine sessions, Lytle wrote to Dr. Hector that Blake "was initially reporting that he was feeling better with an easier time of getting out of bed in the mornings," but "[a]s we have been progressing his program, he is complaining of more thoracic back spasms and difficulty sleeping." R. at 635. After twenty-one sessions, Blake reported to Lytle that "he [wa]s able to walk longer distances before pain sets in, but when 'it hits, it is unbearable.'" R. at 631. His pain level at that time was a constant five out of ten. *Id.* Blake was compliant during the sessions, and by the end Lytle assessed that Blake was "definitely reporting less pain with physical activities since starting therapy," and "[h]is demonstrated functional level has improved while in therapy." R. at 626. Blake's pain level reduced from six out ten to four out of ten. *Id.* Lytle discharged Blake from physical therapy and said Blake should continue pain management treatment. *Id.*

6

On June 19, 2004, at the request of the Disability Determination Bureau, Dr. Arthur Lorber ("Dr. Lorber") conducted a consultative examination of Blake.  R. at 706-11.  Dr. Lorber assessed the flexibility, strength, and range of motion of Blake's neck, back, legs, shoulders, elbows, wrists, and fingers; conducted a neuroforaminal compression test; and assessed Blake's strength, gait, and reflexes.  R. at 709-10.  In addition, Dr. Lorber examined an x-ray of Blake's back.  R at 710.  Dr. Lorber diagnosed Blake with chronic back pain status postoperative lumbosacral fusion procedure and a history of polysubstance abuse.  Dr. Lorber described the polysubstance abuse diagnosis as follows:

> Mr. Blake states that . . . starting at age [eighteen], until one year ago, he was using six "joints", i.e. marijuana, per day.  He sued cocaine on several occasions in 1998.  He used heroin on two occasions in 2001.  Mr. Blake states that he used Minithins, four to five tables, per day, for a period of about a year.  He used acid, i.e. LSD, when he was age [sixteen], on two occasions.

R. at 709.  Furthermore Dr. Lorber noted that "Mr. Blake is felt to be a [sic] unreliable informant, who is confused with regard to events and dates."  R. at 706.

On June 24, 2004, Dr. Hector prepared a report regarding Blake's eligibility for state medical assistance.  R. at 618-24.  Dr. Hector indicated that he had taken multiple x-rays and CT/Mylogram of Blake, which were all "unremarkable," and had conducted a "[t]horough orthopaedic evaluation" of him.  R. at 619.  Dr. Hector determined Blake was compliant with his medications and treatment, and at that time Blake was taking 40 mg daily of Nexium, 150 mg daily of Effexon XR, 7.5/200mg of Vipoprofen, and 10 mg Flexeril.  *Id*.  Dr. Hector determined Blake had "[c]hronic back pain s/p Surgery," the prognosis of which after treatment was "poor."  R. at 621, 622.  Dr. Hector also treated Blake for Depression, the prognosis of which was "[g]ood," and for GERD and Hepatitis C, the

7

prognoses for which were "[e]xcellent."  R. at 622.  Dr. Hector determined that Blake's chronic back pain "adversely affect[ed] his ability to work" and referenced the September 16, 2003, functional capacity evaluation.  R. at 623.  Dr. Hecter claimed the only treatment for Blake's condition was pain medications, and that Blake's functional limitations would not improve enough for him to obtain any type of gainful employment because "chronic back pain rarely resolves."  Id.  Dr. Hector assessed that Blake was significantly limited in his ability to sit, stand, and walk; was moderately limited in his ability to lift, push/pull, bend, squat, climb, drive, do repetitive leg movements, and do normal housework; and was not significantly limited in his ability to grasp/manipulate, crawl, reach above his shoulders, be around machinery, be exposed to temperature/humidity changes, be exposed to fumes or gases, and care for his personal needs.  R. at 624.  Dr. Hector referenced the functional capacity evaluation in support of these conclusions.  Id.

On June 27, 2004, Blake saw Dr. Doug Strobel ("Dr. Strobel"), a neurologist at the Community Health System Pain Management Clinic.  Dr. Strobel determined that Blake had, "at his baseline, chronically dull with radiating sharp pain" that was "primarily in the lumbar region and left hip and [wa]s worse if he s[at] for too long."  R. at 625.  Dr. Strobel refilled Blake's Vicoprofen and prescribed Methadone for Blake's pain, also noting that Blake would benefit from both long-acting and shorter-acting medication for breakthrough pain.  Id.  Additionally, Dr. Strobel prescribed Wellbutrin for Blake's depression.  Id.  He recommended physical therapy, occupational therapy, and psychological counseling.  Id.

On July 27, 2004, Lisa B. Brown, PhD ("Dr. Brown"), consulted with Blake to determine the "appropriateness [of] Interdisciplinary Pain Management and need for behavior medicine intervention."  R. at 614.  Dr. Brown diagnosed Blake with recurrent

8

Major Depressive Disorder and rated his GAF score at sixty.  R. at 616.  She referred Blake

to Gallahue Mental Health Intensive Outpatient Treatment Program.  R. at 617.  On August

18, 2004, Blake went to Gallahue Mental Health Services for an initial evaluation only, and

he then withdrew.  R. at 469-70.


### D.  THE SEPTEMBER 14, 2006, HEARING

On September 14, 2006, ALJ Korte held a hearing regarding Blake's claim.

Attending the hearing were Blake; his attorney, JoAnn Orr ("Orr"); two law students who

assisted Orr; the vocational expert, Stephanie Archer ("Archer"); and two medical experts,

Dr. Richard Hutson ("Dr. Hutson") and Dr. Georgiann Pitcher ("Dr. Pitcher").

Prior to the hearing, ALJ Korte held a pre-hearing conference to discuss, among

other things, the motion to continue the hearing that Orr had filed on September 8, 2006.

At this hearing, Orr told ALJ Korte on the record that she never received notice of the

hearing.  R. at 828.   Apparently, Orr found out about the hearing by calling the Office of

Disability Adjudication and Review.  Id.  Someone from that office told Orr that there would

be no experts.  R. at 830.  Orr requested ALJ Korte give additional time to allow her and

her interns to more adequately prepare for cross-examination of the expert witnesses.

R. at 828-29.  ALJ Korte denied Orr's motion.   At the beginning of the hearing, which

started sometime after 1:30 p.m., ALJ Korte notified everyone that the hearing would need

to conclude by 3:00 p.m because he needed to leave.  R. at 826, 834.

Dr. Hutson was the first to testify at the hearing.  Dr. Hutson testified that, based on

Blake's medical history, Blake "could do no more than sedentary work by definition."

R. at 837.  Additionally, Blake would need a sit/stand option at the work station where he

could stand up five minutes out of every hour; could withstand only occasional trunk rotation; no exposure to cold, heat, wetness, humidity, vibration, and hazards; and no ladders, ropes, or scaffolds.  *Id.*  Orr cross-examined Dr. Hutson.  In answering her questions, Dr. Hutson further testified that sometimes multiple surgeries can result in chronic back problems, that sometimes the pain killers Blake took could cause difficulty with concentration, and that it was no surprise that there had been no significant change in Blake's enterolisthesis following the surgeries.  R. at 838-39, 41.  After Dr. Hutson testified, ALJ Korte excused him from the proceedings.  *Id.* at 842.

Next, Dr. Pitcher testified regarding Blake's mental status.  R. at 842.  She reviewed his mental health history and concluded that Blake's mental impairments were non-severe. R. at 842-45.  Accordingly, Dr. Pitcher had nothing to add to Blake's RFC.  R. at 845.  On cross-examination, Dr. Pitcher admitted she had not seen Blake's diagnosis of Major Depressive Disorder.  After Dr. Pitcher finished testifying, ALJ Korte told her she was "free to go."  R. at 847.

ALJ Korte asked the vocational expert, Archer, what jobs were available for the RFC of light and unskilled.  R. at 848.  Archer cited production jobs in Indiana, including Assemblers—4,650, Machine Tenders—2,200, and Inspector Packers—1,100.  R. at 849. She further testified that there are close to two hundred different DOT titles at the unskilled sedentary level.  *Id.*  When asked whether a sustained positional tolerance of no longer than fifteen minutes would limit the number of light and unskilled jobs, Archer testified the limitation would make it "difficult to maintain production."  *Id.* at 851.  Orr asked Archer whether having a significant limitation on sitting in addition to standing changes her

testimony regarding the jobs Blake could perform.  *Id.* at 850.  Archer responded, "Then he would not be able to work."  *Id.* at 851.

Next, Blake testified.  Blake's daily routine consisted of getting up at 7:00 a.m. and getting his son ready for school.  R. at 853.  He fed his son and four-year-old daughter breakfast, which consisted of pouring cereal—his son "would do the milk."  R. at 853, 861. After his son would leave for school he performed simple chores and watched his daughter. R. at 853.  Simple chores included folding laundry and fixing simple meals.  *Id.*  He had a computer and would send emails and surf the web.  *Id.*  He could drive for up to a half hour. *Id.*  He occasionally went to the store with his girlfriend but would not lift heavy items.  *Id.* He would watch television and rent movies to watch with his kids and girlfriend.  *Id.*  He would take his son to baseball games; he used to help as an assistant coach where he would just sit in the box, but that became too difficult.  *Id.*  He had bars in his bathroom so he could get in the tub and use the toilet.  R. at 869.

Blake testified that his back pain was "way worse" in 2004 than in 2002, and that the pain still continued.  R. at 856-57.  He said his medications made him dizzy and gave him a dry mouth.  R. at 858.  He said he fell asleep easily and would call his mother or his girlfriend's mother to pick up his daughter to ensure that she stayed safe.  R. at 858, 867. He said he was too drowsy to function.  R. at 858.  Blake exercised, but nothing helped. R. at 857.  Hot and cold compressions did not help.  R. at 859.  Blake testified that he used a cane because if he did not, his left leg hurt so badly at his hip that he could not pick it up. *Id.*  He testified that after going to physical therapy he would feel worse, and that eventually he was told nothing more could be done and was sent to a doctor to get pain medicine.  R. at 860.  The pain was located in his lower back, left leg, neck, and

underneath his shoulder blades.  R. at 857, 862.  He used medicine, a TENS unit, and exercise to clam the knots in his muscles so he could sleep.  R. at 862.

Blake said that when he would go to the mall, he had to look for a bench to sit down halfway through the store.  R. at 863.  If he stood for about twenty minutes, he would get shooting pain down the back part of his leg, his toe falls asleep, and his hip hurts too badly to move.  R. at 864.  He said that sitting in the chair at the hearing "just irritate[ed] [his] back real bad."  R. at 863.  In 2002, Blake was unable to drive because he was still using a body cast to move, but in 2004 he could drive.  R. at 868-69.  In 2002, Blake could lift twenty pounds, and in 2004 he could lift "maybe [thirty] pounds" because he was "simply just getting used to the constant pain."  R. at 864.  In 2002, Blake could only walk to the end of his driveway.  R. at 866.  In 2004, Blake could walk to the neighbor's house before he would have to go back home.  R. at 866.

The hearing concluded at 2:43 p.m.  R. at 871.

## E.  ALJ KORTE'S JULY 27, 2007, DECISION

On July 27, 2007, ALJ Korte determined that Blake's disability ended on July 1, 2004.  In reaching this decision, ALJ Korte first determined that Blake did not develop any additional impairments after the CPD.  R. at 20.  ALJ Korte considered Blake's mental impairments and determined that they were "so slight" that they were "not severe when considered individually."  R. at 22.  ALJ Korte stated he nonetheless "considered those impairments in combination with his other impairments at the remaining steps of [his] analysis."  *Id.*  ALJ Korte further determined that Blake's back impairments did not meet or medically equal the criteria of Listing 1.04 (disorders of the spine).  R. at 22.

12

Next, ALJ Korte determined the medical evidence supported a finding that Blake's condition improved as of July 1, 2004.  More specifically, ALJ Korte determined that Blake had the RFC to perform sedentary exertional work with the following additional restrictions:

> The claimant should be allowed a sit/stand option at the workstation in which he could stand for five nonconsecutive minutes out of every hour.  The claimant would be limited to occasional trunk rotation.  He should not be required to climb ladders, ropes, or scaffolds.  He can occassionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  He should avoid concentrated exposure to cold, heat, wetness, humidity, vibration and hazards.

R. at 24.  ALJ Korte noted that this RFC was a lesser exertional level than given by the State Agency physicians, but reached this RFC after considering all symptoms to the extent consistent with objective medical evidence and other evidence.  *Id*.

ALJ Korte considered Blake's examinations with Drs. Lorber and Hector and the evaluations by Community Rehabilitative Services and Gallahue Mental Health Center.  R. at 24-25.  He also considered Dr. Hutson's testimony that Blake could do no more than sedentary work due to his multilevel degenerative disc disease and subsequent three back surgeries.  R. at 18, 25, 837.  ALJ Korte incorporated other restrictions into the RFC that Dr. Hutson had listed.  R. at 25.

ALJ Korte determined the information Blake provided was not entirely reliable.  In support of this determination, ALJ Korte noted that Blake "has inconsistently reported the use of illegal drugs."  R. at 26.  He compared Blake's denial of alcohol or illegal drug use to Dr. Cathy Scott in March 2001 with Blake's varied admissions to several healthcare workers of drug use.  Furthermore, ALJ Korte noticed that Blake "was able to sit throughout the hearing, which lasted over an hour, without any noted distractions or overt pain behavior."  *Id*.  ALJ Korte also considered the medical record regarding Blake's ability to

13

ambulate, his range of motion, and his daily activities.  ALJ Korte accepted Blake's allegations of symptoms and his inability to function only to a moderate degree, but concluded that Blake was "not credible to the extent that his capacity was so limited he was unable to engage in substantial gainful activity consistent with the residual functional capacity" that ALJ Korte assessed.  R. at 28.

ALJ Korte took into account Blake's alleged sleepiness from the medications and continuing back pain in assessing Blake's RFC.  *Id.*  He noted that Blake had undergone three surgeries and attended physical therapy for relief of pain.  R. at 27.  ALJ Korte determined that physical therapy helped reduce Blake's pain and increased his function.  R. at 27.

ALJ Korte disagreed with Dr. Hector's opinion that Blake's limitations were substantial enough to prevent him from any type of gainful employment.  *Id.*  He also rendered Dr. Hector's opinion less persuasive because it contained inconsistencies.  *Id.*  In particular, Dr. Hector said that Blake's x-rays were "unremarkable" and that his gait was within normal limits, but Dr. Hector later indicated that Blake had significant limitations with walking.  R. at 27.  Furthermore, ALJ Korte determined that Dr. Hector's reliance on Lytle's RFC rendered Dr. Hector's opinion less reliable because the report "noted while the claimant's overall inconsistencies were minor, it was felt the claimant could do more at times that [sic] he currently stated or perceived."  *Id.*  Thus, ALJ Korte gave Dr. Hector's opinion little weight.

ALJ Korte ultimately determined that as of July 1, 2004, Blake's impairments continued to be severe, that he was still unable to perform relevant past work, that he had a limited education, but that he was medically improved such that he had the RFC to

14

perform a significant number of jobs in the national economy.  R. at 28-30.  In making this determination, ALJ Korte accepted Archer's testimony regarding the availability in the national economy of unskilled sedentary jobs that also took into account Blake's additional limitations.  Because a significant number of such jobs existed that Blake could perform, ALJ Korte determined that, as of July 1, 2004, Blake was not disabled as defined by the Social Security Act.

## II. DISABILITY AND STANDARD OF REVIEW

To determine whether a claimant continues to be disabled, the ALJ applies an eight-step process for the Title II claim, as set forth in 20 C.F.R. § 404.1594(f), and a seven-step process for the Title XVI claim, as set forth in 20 C.F.R. § 416.994(b)(5):

(1)     Is the claimant engaged in substantial gainful activity? If so, the disability has ended. (This factor is not applicable to the Title XVI claim.)

(2)     If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment?  If so, the disability will be found to continue.

(3)     If not, has there been a medical improvement? If so, go to step (4). If not, go to step (5).

(4)     Is the medical improvement related to the claimant's ability to do work; i.e., has there been an increase in the claimant's RFC?  If not, go to step (5).  If so, go to step (6).

(5)     If at step (3) there has been no medical improvement, or if at step (4) medical improvement is not related to ability to do work, do any exceptions apply?  If [so], then we look to step (6).  If an exception from the second group applies, then the disability has ended.

(6)     Are the claimant's current impairments severe in combination?  If not, the disability has ended.

15

(7)     If so, can the claimant (based on his or her residual functional capacity) perform his or her past relevant work?  If so, the disability ends.

(8)     If not, can the claimant do other work given his or her residual functional capacity, age, education, and work experience?  If so, the disability has ended.

*Hannum v. Barnhart*, Case No. 1:04-cv-01445-DFH-TAB, 2005 U.S. Dist. LEXIS 15472 at *14-15, 2005 WL 1799433 at *5 (S.D. Ind. July 27, 2005); *see also* 20 C.F.R. § 404.1594(f).

A determination on whether disability benefits should be terminated "shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."  42 U.S.C. § 423(f).  The Court "will uphold the ALJ's decision so long as it is supported by substantial evidence in the record."  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  "The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion."  *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

16

### III.  DISCUSSION

Blake argues the ALJ Korte's decision should be reversed or remanded because ALJ Korte erred when he: (1) accorded little weight to Blake's treating physician; (2) incorrectly assessed Blake's activities of daily living to conclude that Blake could perform work related activities; (3) concluded Blake was not credible; (4) failed to consider Blake's impairments in the aggregate; (5) ruled Blake had improved medically; and (6) denied Blake due process at the hearing.  Pl.'s Br. at 2.

### A.  WEIGHT OF DR. HECTOR'S OPINION

ALJ Korte determined that by 2004 Blake's RFC increased such that he was no longer disabled, relying on the opinion of Dr. Hutson and disagreeing with the opinion given by treating physician Dr. Hector.  R. at 25, 27.  Blake argues that ALJ Korte did not give Dr. Hector's opinion enough weight.

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record."  *Skarbek,* 390 F.3d at 503; *see also* 20 C.F.R. § 416.927(d)(2).  ALJ Korte gave little weight to Dr. Hector's report reasoning that it "appears to contain inconsistencies."  R. at 27.  ALJ Korte explained that Dr. Hector noted that the Blake's x-rays were "unremarkable" and his gait was within normal limits, and yet later said that Blake had significant limitations walking.  ALJ Korte also justified discounting Dr. Hector's opinion because Dr. Hector relied on the September 16, 2003, functional capacity

17

evaluation, which qualified that the claimant could do more at times than he currently stated or perceived.

Some opinions, such as whether a claimant is "disabled" or "unable to work," are reserved for the  Commissioner, § 416.927(e)(1), and an ALJ need not give any special significance to opinions by a treating physician on such matters.  § 416.927(e)(2).  Thus, ALJ Korte need not give special consideration to Dr. Hector's conclusion that Blake is not a candidate for competitive employment.  *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

However, ALJ Korte failed to articulate a good reason for not affording more weight to Dr. Hector's conclusions regarding the nature and severity of Blake's impairments.  *See* 20 C.F.R. § 404.1527(d)-(e); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  A treating doctor's opinion can be given less weight if internally inconsistent, *see Nicholson v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2009), but ALJ Korte failed to sufficiently articulate why Dr. Hector's report is inconsistent.  An unremarkable x-ray and normal gait do not necessarily preclude a limitation in walking due to pain.  The other reason ALJ Korte gives for discrediting Dr. Hector's opinion is that Dr. Hector relied on the assessment by Lytle, who stated that Blake could often do more than he stated or perceived.  This qualification by Lytle does not render Lytle's assessment of Blake unreliable.  Rather, it calls into question Blake's assessment of his own ability.  It does not undermine the conclusions of Lytle, who presumably reported what Blake was actually able to do, not what Blake perceived or stated to Lytle that he could do.

Additionally, ALJ Korte did not address the evidence in the record that supports Dr. Hector's opinions.  For example, Dr. Hutson's opinions do not necessarily conflict with Dr.

18

Hutson's opinions.  Dr. Hutson determined that Blake "could do no more than sedentary work by definition," R. at 837, and concluded that Blake would need a sit/stand option at his work station.  This comports with Dr. Hector's opinion that Blake has limitations sitting, standing, and walking.  Likewise, Dr. Strobel's assessment of Blake also supports Dr. Hector's opinion that Blake has difficulty both standing and sitting.  Dr. Strobel noted that Blake's pain gets worse if he sits too long.  He prescribed to Blake Vicoprofen and Methadone, noting that Blake would benefit from both long-acting and shorter-acting medication for breakthrough pain.  Furthermore, upon deciding not to give Dr. Hector's opinions controlling weight, ALJ Korte did not consider the length, nature, extent of the treatment relationship, and frequency of examination as required by the regulations to determine what weight to give the opinion. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 1527(d)(2).

Giving little weight to Dr. Hector's opinion is significant.  ALJ Korte's RFC does not take into consideration Dr. Hector's determination that Blake has severe limitations in his ability to sit, stand or walk.  ALJ Korte's RFC of Blake is for sedentary work, meaning "lifting no more than [ten] pounds at a time; occasionally lifting or carrying articles like docket files, ledgers, and small tools; and [where] walking and standing are required only occasionally (no more than two hours in an eight hour workday)."  R. at 24.  The conclusion that Blake need only walk or stand occasionally assumes that the rest of the time he would be sitting, but according to Dr. Hector, Blake has severe limitations sitting as well.  Archer testified at the hearing that if Blake had limitations on sitting in addition to standing, Blake would not be able to work.  Based on this testimony, a determination of disability is hard to avoid if Dr. Hector's opinions are accepted.

On remand, the ALJ must reassess and rearticulate the weight to give Dr. Hector's opinion in light of the objective medical evidence and the record as a whole, including those parts of the record that support Dr. Hector's position.

## B. BLAKE'S DAILY ACTIVITIES

Blake argues that ALJ Korte overstated the daily activities Blake was able to perform and then erroneously equated his limited abilities to being able to perform gainful employment.  Dkt. No. 18 at 18 (citing *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008)).  The Commissioner points out that even Lytle noted that Blake stayed home with his children while his spouse worked, which seemed to indicate that he was capable of some kind of work.  Dkt. No. 23 at 19.

ALJ Korte did not place undue weight on the claimant's household activities as Blake suggests.  Rather, ALJ Korte stated that Blake's testimony about his activities could not "be objectively verified with any reasonable degree of certainty."  R. at 28.  ALJ Korte also concluded that if Blake's activities were as limited as he alleged, it would be "difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in [ALJ Korte's] decision." R. at 28.  In essence, ALJ Korte called into question Blake's credibility regarding his testimony about daily activities of living.  Blake's argument that ALJ Korte overstated his daily activities of living does not accurately portray ALJ Korte's decision.  As such, this argument is without merit.  The issue of Blake's credibility is discussed below.

## C. FINDING THAT BLAKE IS NOT CREDIBLE

Blake contends that ALJ Korte erred in relying on Blake's inconsistent statements to doctors about his prior drug use as the basis for his opinion that Blake is not credible. Blake contends that because he was not asked about his illegal drug use at the hearing, he did not have an opportunity to clarify; his alleged drug use was not relevant to the opinions of the medical doctors; and his sworn statements regarding his pain, symptoms, impairments, and daily activities are consistent throughout the record. Dkt. No. 18 at 15-16. Blake further argues that ALJ Korte erred by using the "sit and squirm" test as a factor in assessing Blake's credibility. *Id.* at 18 (citing *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000)). The Commissioner counters that ALJ Korte "did not rely on observation alone, but was certainly entitled to note that Plaintiff was able to sit significantly longer than he testified." Dkt. No. 23 at 18.

"An ALJ is in the best position to determine the credibility of witnesses," and the Court will "overturn a credibility determination only if it is patently wrong." *Craft*, 539 F.3d at 678. In making a credibility determination, the ALJ "must consider the entire case record, including objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." S.S.R. 96-7p, 1996 SSR 4; *see also Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

ALJ Korte determined that Blake was not entirely credible based on Blake's inconsistent statements to doctors regarding drug use and his demeanor during the hearing. Alone, these factors might not adequately call into question Blake's credibility.

21

However, ALJ Korte also considered other aspects of the record.  For example, ALJ Korte discussed Blake's ability to ambulate with a stable gait and without the use of a cane, his ability to care for his children and do simple chores, his moderately reduced range of motion of the lumbar spine with a bilateral negative straight leg raising, and his range of motion in his extremities.  R. at 26.  Furthermore, Lytle concluded that Blake could to more at times than he stated or perceived.  Likewise, Dr. Lorber noted that Blake was confused as to events and dates and that he felt Blake was an unreliable informant.  R. at 706.  In light of all of these considerations, ALJ Korte's credibility finding was not patently wrong.

## D.  FAILING TO CONSIDER BLAKE'S IMPAIRMENTS IN THE AGGREGATE

Blake argues that ALJ Korte failed to fully consider Blake's depression and pain medications when considering what range of work Blake could perform.  Dkt. No. 18 at 19. Blake points to his GAF score of sixty, which indicated "moderate symptoms," whereas ALJ Korte characterized Blake's limitations from mental impairments as "slight."  *Id.* at 20; R. at 21-22.  Blake also points out that ALJ Korte determined that there was no evidence of significantly limiting side effects with regards to Blake's medication, despite Blake's testimony that he often needed to obtain help with his daughter to keep her safe because of sleepiness caused by his medications.

When, as in this case, the claimant has severe impairments but his symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment, the ALJ is to "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity."  20 C.F.R. § 404.1545(e); *see also Terry*, 580 F.3d at 477 ("[A]n ALJ must consider the combined

22

effects of all of the claimant's impairments, even those that would not be considered severe in isolation.")

With regard to the effect of Blake's medications, ALJ Korte considered claimant's "alleged sleepiness with his medications" but said he saw "no evidence of significantly limiting side effects with regard to [Blake's] medication." R. at 26-27. Indeed, the main evidence of the side effects of this medication is Blake's testimony at the hearing, which the ALJ determined was less than credible—a determination this Court concluded above was not patently wrong.

On the other hand, ALJ Korte did not sufficiently consider Blake's mental impairments in his RFC analysis. ALJ Korte said Blake's mental impairments were "so slight" that they were not severe impairments when considered individually, but that he nonetheless "considered those impairments in combination with [Blake's] other impairments at the remaining steps" of his analysis. R. at 22. In his RFC analysis, ALJ Korte described an appointment Blake had with Community Rehabilitative Services. R. at 25. However, nowhere did ALJ Korte discuss how Blake's recurrent major depressive disorder and his GAF of sixty affected his RFC. On remand, the ALJ should give due consideration and discussion to the evidence regarding Blake's mental impairments and how they affect Blake's ability to work. *See Terry*, 580 F.3d at 477.

23

### E.  RULING THAT BLAKE HAS MEDICALLY IMPROVED

Whether Blake has medically improved enough that he is now able to work depends on his RFC, which the ALJ is to reaccess on remand.  Thus, on remand, the ALJ must also reassess whether Blake has medically improved enough to work.

### F.  DENYING BLAKE DUE PROCESS AT THE HEARING

Blake argues that he was not given due process at the hearing for three reasons: (1) ALJ Korte imposed an artificial time limit on the proceedings from the beginning; (2) Blake's attorney was not provided advanced written notice of the administrative hearing and that there would be three experts testifying; and (3) ALJ Korte excused the experts after they testified without requiring them to remain for Blake's testimony.  In response, the Commissioner primarily argues that the Court must presume that ALJ Korte was unbiased and Blake must overcome this presumption by showing that ALJ Korte had some conflict or engaged in conduct that deprived the hearing of fundamental fairness.  Dkt. No. 23 at 19 (citing *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); and *Liteky v. United States*, 510 U.S. 540, 555-56 (1994)).

Blake contends that ALJ Korte's time limitation at the outset of the hearing "shifted the focus of the hearing from determining disability to rushing through the necessary procedures within the appointed time."  Pl.'s Br. at 22.  Ultimately nothing in the record indicates that Blake was prejudiced by ALJ Korte's instruction regarding the timing of the hearing.  All three experts and Blake each testified, and the hearing concluded by 2:43 p.m., sooner than ALJ Korte had indicated.

Blake also argues he was unable to adequately address the experts at the hearing. In particular, Blake contends that the result of ALJ Korte's dismissal of the experts without having heard Blake's testimony is that "Blake's representatives were not able to give a full cross-examination," and '[t]here was no meaningful opportunity for the medical experts to include consideration of Mr. Blake's testimony in support of his disability claim . . . ." *Id.* at 23.[5]  Blake also contends that his attorney was unable to effectively cross-examine the experts because the agency failed to provide her written notice and then orally told her there would be no experts at the hearing.

The interest of an individual in the continued receipt of Social Security disability benefits is a statutorily created "property" interest protected by the Due Process Clause of the Fifth Amendment.  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "A fair trial in a fair tribunal is a basic requirement of due process."  *Keith v. Barhart*, 473 F.3d 782, 787 (7th Cir. 2007).  The Third Circuit has a helpful list of minimum standards for an administrative hearing, one of which is an effective opportunity to confront and cross-examine adverse witnesses.  *Mattern v. Mathews,* 582 F.2d 248, 259 (3d Cir. 1978).  While the expert witnesses at the hearing were not necessarily adverse to Blake, he nonetheless had a right to effectively cross-examine them.

---

[5] Blake cites to the Hearings, Appeals and Litigation Manual ("HALLEX") I-2-6-70(B)(2), which states:  "The [medical expert] may attend the entire hearing, but this is not required.  If the [medical expert] was not present to hear pertinent testimony, e.g., testimony regarding the claimant's current medications, sources and types of treatment, etc., the ALJ will summarize for the [medical expert] on the record."  The Seventh Circuit has not directly addressed the legal force of HALLEX.  *See Cromer v. Apfel*, 2000 U.S. App. LEXIS 26861, *5-9 (7th Cir. 2000).

Blake was not prejudiced by the experts not hearing his testimony.  Presumably the experts had access to the record, including Blake's testimony in the first hearing and ALJ Tranovich's reliance thereon in the CPD.  Blake's testimony at the more recent hearing did not differ significantly from that testimony.  Likewise, the record shows that Orr had sufficient time to prepare for cross-examination of the experts at the hearing.  She found out about the experts on September 7, 2006, one week before the hearing.  R. at 31.  Furthermore, Orr represented at the hearing that she had prepared to cross-examine the experts.  R. at 827-28.  While perhaps ALJ Korte's orchestration of the hearing could have been more lenient to Blake, particularly given the miscommunications by the agency, ALJ Korte's decisions did not, ultimately, violate Blake's right to a fair hearing.

## IV. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner of the Social Security Administration in this case is **REMANDED** for further proceedings consistent with this opinion.

Date:  02/22/2010

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Andrew A. Ault
INDIANA LEGAL SERVICES, INC.
andrew.ault@ilsi.net

Annette Sanderson Biesecker
INDIANA LEGAL SERVICES, INC.
annette.biesecker@ilsi.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov